WHITEHEAD OIL COMPANY, A CORPORATION, APPELLEE, V. CITY OF LINCOLN, NEBRASKA, A MUNICIPAL CORPORATION, APPELLANT.

515 N.W.2d 390

Filed April 22, 1994. No. S-92-422.

William F. Austin, Lincoln City Attorney, for appellant.

William G. Blake, of Pierson, Fitchett, Hunzeker, Blake & Loftis, for appellee.

BOSLAUGH, CAPORALE, FAHRNBRUCH, and LANPHIER, JJ., and GRANT, J., Retired, and RIST, D.J., and RONIN, D.J., Retired.

CAPORALE, J.

## I. STATEMENT OF CASE

This is the second appearance of this matter in this court, which arises out of the refusal of the defendant and present appellant, City of Lincoln, to issue a permit entitling the plaintiff and present appellee, Whitehead Oil Company, to use

its property in a particular way. In the first appearance, we, in *Whitehead Oil Co. v. City of Lincoln*, 234 Neb. 527, 451 N.W.2d 702 (1990) (*Whitehead Oil I*), held that the district court had erred in granting the city a summary judgment on Whitehead Oil's challenge to the city's refusal to grant a land-use permit and accordingly remanded the matter for further proceedings. Following those proceedings, the district court reversed the city's decision and remanded the matter to the city, directing that it reconsider Whitehead Oil's use application. The city appealed to the Nebraska Court of Appeals, claiming that the district court erred in so ruling. Under the authority granted by Neb. Rev. Stat. § 24-1106(3) (Cum. Supp. 1992), we removed the matter to this court in order to regulate the caseloads of the appellate courts. We affirm as modified, and remand with direction.

## II. SCOPE OF REVIEW

Whitehead Oil's appeal to the district court was taken pursuant to Neb. Rev. Stat. § 15-1201 (Reissue 1991) as an appeal from a final decision or order of the city council of a city of the primary class. Neb. Rev. Stat. § 15-101 (Reissue 1991). According to Neb. Rev. Stat. § 15-1205 (Reissue 1991): "The district court shall hear the appeal as in equity and without a jury and determine anew all questions raised before the city."

In an action seeking injunctive relief from an ordinance vacating a public street, we, without referring to § 15-1205, wrote:

It is apparent that under these statutory and charter provisions, the city council has the discretionary power to vacate streets and alleys. The exercise of this discretionary power "is not ordinarily subject to judicial review, unless there has been abuse of discretion, fraud, or glaring informality or illegality in proceedings, or absence of jurisdiction." Hanson v. City of Omaha, *supra*. See, also, 11 McQuillin, Municipal Corporations, § 30.187, p. 116 (3d Ed., 1977). In the present case, there was no evidence of fraud, informality or illegality in proceedings, or absence of jurisdiction. Therefore, the issue subject to judicial review is whether the city council so abused its

discretion that the vacation ordinance can be held to be unreasonable and arbitrary.

*Cather & Sons Constr., Inc. v. City of Lincoln*, 200 Neb. 510, 519, 264 N.W.2d 413, 419 (1978).

We have also held that an appeal from an order or decision of the human rights commission of a city of the primary class, pursuant to § 15-1201, is to be heard as in equity and, upon further appeal to this court, is to be reviewed as an equity action. *American Stores v. Jordan*, 213 Neb. 213, 328 N.W.2d 756 (1982).

In *Copple v. City of Lincoln*, 210 Neb. 504, 315 N.W.2d 628 (1982), we clarified that § 15-1201 applies only where the various bodies controlled thereby act judicially or quasi-judicially. Were it otherwise, the statute would delegate legislative power to the courts in contravention of Neb. Const. art. II, § 1. Accordingly, we therein held that as the enactment of a zoning ordinance by a city of the primary class is a purely legislative act, such an enactment does not give rise to a direct appeal, the only remedy being by a collateral attack, such as seeking an injunction.

In *Bowman v. City of York*, 240 Neb. 201, 482 N.W.2d 537 (1992), after a review of prior decisions holding that consideration of the validity of a zoning ordinance was an equitable matter, we determined that a challenge of a zoning variance granted by a board of adjustment pursuant to Neb. Rev. Stat. §§ 19-910 and 19-912 (Reissue 1991) is not to be reviewed as an equitable matter. We announced the resulting standard of review as follows:

The considerations discussed in the foregoing two cases, coupled with the fact that § 19-912 permits an appeal to the district court only on the ground that a board of adjustment's decision is illegal, lead us to conclude that a district court may disturb a decision of such a board only if, as suggested in *Frank v. Russell*, 160 Neb. 354, 70 N.W.2d 306 (1955), and *Mossman v. City of Columbus*, 234 Neb. 78, 449 N.W.2d 214 (1989), the decision was illegal or is not supported by the evidence and is thus arbitrary, unreasonable, or clearly wrong. In deciding whether a board's decision is supported by the evidence,

the district court shall consider any additional evidence it receives. See, e.g., *Demarest v. Mayor & Council of Bor. of Hillsdale*, 158 N.J. Super. 507, 386 A.2d 875 (1978); *Richman v. Zoning Bd. of Adj.*, 391 Pa. 254, 137 A.2d 280 (1958).

. . . .

We therefore now hold that an appellate court reviews the decision of the district court and that irrespective of whether the district court took additional evidence, the appellate court is to decide if, in reviewing a decision of a board of adjustment, the district court abused its discretion or made an error of law. Where competent evidence supports the district court's factual findings, the appellate court will not substitute its factual findings for those of the district court. See, *Lambros v. Missoula*, 153 Mont. 20, 452 P.2d 398 (1969); *Estate of Barbagallo v. Zoning Hear. Bd.*, 133 Pa. Commw. 38, 574 A.2d 1171 (1990).

*Bowman*, 240 Neb. at 210-11, 482 N.W.2d at 544. Accord *Barrett v. City of Bellevue*, 242 Neb. 548, 495 N.W.2d 646 (1993).

*Stratbucker Children's Trust v. Zoning Bd. of Appeals*, 243 Neb. 68, 497 N.W.2d 671 (1993), adopted the same scope of review for an appeal taken to the zoning board of appeals of a city of the metropolitan class under the provisions of Neb. Rev. Stat. §§ 14-408, 14-413, and 14-414 (Reissue 1991).

However, § 15-1205, which controls the standard of review for appeals from decisions of the various organs of a city of the primary class, does not limit review to illegality, but, instead, provides that the appeal shall be considered as in equity. Decisions concerning the issuance of use permits involve the exercise of discretion in the application of use standards to the specific characteristics of the property in question. Such decisions are therefore quasi-judicial in nature and reviewable under the provisions of § 15-1201 as in equity in both the trial and appellate courts. See *Mossman v. City of Columbus*, 234 Neb. 78, 449 N.W.2d 214 (1989) (board of adjustment exercising discretion acts judicially).

In an appeal from an equitable action, the reviewing court

reviews the action de novo on the record and reaches a conclusion independent of the factual findings of the lower court; however, where credible evidence is in conflict on a material issue of fact, the reviewing court considers and may give weight to the circumstance that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. See, *Rigel Corp. v. Cutchall, ante* p. 118, 511 N.W.2d 519 (1994); *Village of Brady v. Melcher*, 243 Neb. 728, 502 N.W.2d 458 (1993).

### III. FACTS

Whitehead Oil owns and operates gasoline service stations and convenience stores which combine the sale of gasoline and general retail merchandise. In 1968, it purchased a .5-acre parcel of land on the north side of Old Cheney Road in Lincoln at about 25th Street. The property was a part of a larger 9.3-acre parcel of land which, at that time, was zoned G-1, a planned commercial district permitting general commercial uses, including retail stores and service stations. We hereafter refer to this piece of land as the larger parcel.

The comprehensive plan then in effect of the Lincoln City-Lancaster County Planning and Zoning Commission, hereafter the commission, envisioned that the larger parcel would be developed as a neighborhood shopping center. The plan was adopted in 1961.

At the time of purchase, Whitehead Oil intended to use its property as a site to sell gasoline at a service station, once the surroundings developed to the extent necessary to support such a business. Not until almost 20 years later did Whitehead Oil conclude that the surroundings had developed sufficiently to support such an operation. As the surroundings developed, a solid row of multifamily dwellings was built along the west side of the larger parcel. The land directly north of the larger parcel is occupied by a church, and there is a row of multifamily dwellings across the street to the north. In the early 1970's, Lincoln Mutual Life Insurance Company built a large office building at the southeast corner of the larger parcel, to the northwest of the intersection of 27th Street and Old Cheney Road.

In 1977, the city and county adopted a new comprehensive plan. The land-use-map part of the plan designated 28 neighborhood centers for local retail commercial uses and designated other larger commercial areas as regional multiuse centers. The neighborhood centers were to contain up to 50,000 square feet of commercial space. Included as one of the stated policies of the 1977 plan was the encouragement of downtown office development by the use of restrictive zoning policies to deter the expansion of office employment centers to other areas of Lincoln.

Although the larger parcel had been designated as a neighborhood shopping center in the 1961 plan, no such designation was noted in the 1977 plan; rather, the larger parcel was designated as a residential area. Although the plan refers to 28 neighborhood shopping areas in addition to those which had already been developed, Douglas Brogden, the city's planning director from 1959 through 1982, was able to identify only 25 so identified in the plan. In Brogden's opinion, nothing had changed to warrant the removal of the larger parcel from retail or neighborhood shopping center uses. On the other hand, Verl Borg, to whom Brogden had delegated the assignment of the neighborhood centers in the 1977 plan and who is still employed by the city, testified that he had specifically considered whether the larger parcel should retain its neighborhood center designation in the 1977 plan, and recommended that it be removed because of the insurance office building which had been built on the corner. In Borg's view, the office building had taken the heart of the area, and there really was not much usable property left for a neighborhood shopping center.

In 1979, a new comprehensive zoning ordinance was prepared to implement the 1977 comprehensive plan. The 1979 zoning code did not contain a G-1 zone, and the larger parcel was rezoned B-2, which was the successor designation for planned neighborhood shopping districts. B-2 districts are substantially the same as the prior G-1 districts and specifically include as permitted uses service stations and stores or shops for the sale of goods at retail. No change of zoning was discussed or proposed for Whitehead Oil's property.

The major difference in the 1979 code was the

implementation of a system employing use permits, which prohibit any construction or even any open land use in B-2 districts, other than farming and the sale of farm produce, prior to the approval of a use permit. The use permit process was adopted as a site-planning tool to integrate permitted uses into an area while eliminating or minimizing adverse impact to the surrounding property according to the standards and guidelines of the zoning code.

Sometime between the 1979 zoning code and 1982, a use permit was issued for construction of a bank to the north of Lincoln Mutual's office building, a use permitted in B-2 districts.

In April 1982, Lincoln Mutual applied for a use permit to allow it to develop and construct an office park on three lots in a portion of the larger parcel lying to the north of Whitehead Oil's property and Lincoln Mutual's office building. This area included all of the larger parcel zoned B-2 which had not been previously developed, except for Whitehead Oil's property. The proposed use permit was for three office buildings with a total of 51,600 square feet of floor space and 172 parking spaces. The use permit was approved after an amendment changing the use to "office/retail park." As a direct result of Lincoln Mutual's use permit to add office space in a B-2 district, which, although not prohibited by the zoning code, was in contravention of the policy of the comprehensive plan, Brogden initiated a petition to amend the zoning ordinance so as to limit office use in B-2 districts to 10 percent of the total approved floor area of each use permit. However, the city did not adopt this proposed amendment. The property affected by Lincoln Mutual's use permit for an office-retail park remains vacant and has not yet been developed.

In 1985, still another comprehensive plan was adopted. The "Generalized Future Urban Land Use" map constituting a part of the plan continued to designate the larger parcel as residential. The 1985 plan retains a policy of limiting the growth of offices outside the downtown area to less than one-half of the new private office growth during the planning period and limiting office growth outside regional and community multiuse centers to business and industrial areas already

approved for such uses. The plan does, however, state: "Additional free standing office parks could be approved if such sites are needed to accommodate unforeseen major new development opportunities."

On October 27, 1986, Whitehead Oil filed its application for a permit to construct and use a convenience store, service station, and self-service carwash on its property. The commission's staff report recognized the request as being for permitted uses in the B-2 district; however, it recommended denial due in general to the requested variances and concern that the design does not minimize the impact to the adjacent residential uses. The requested code variances included the front yard setback of 41 feet as opposed to the required 50 feet, a drive in the side yard 4 feet from the side lot line, and inadequate screening.

On November 7, 1986, Garner Stoll, who had succeeded Brogden as the commission's director, filed a petition to amend the zoning ordinance for B-2 districts so as to prohibit gas pumps and canopies within the 50-foot front yard setback unless specifically approved as a part of the use permit. Stoll requested the amendment due to shortcomings in the zoning text he perceived while reviewing the Whitehead Oil use permit application. The proposed amendment was to the text of the zoning ordinance and not to the underlying zoning of Whitehead Oil's property.

The zoning ordinance amendment and Whitehead Oil's use permit application were referred to the commission for public hearing and recommendation, and both matters were before the commission for hearing on November 19, 1986. There was considerable public opposition to the Whitehead Oil permit. On November 26, Whitehead Oil requested that action on both matters be deferred until the commission's December 17 meeting. The commission deferred consideration of the use permit application, but declined to defer action on the zoning amendment, which it recommended be approved and forwarded to the city council.

Whitehead Oil's representatives met with the commission's staff members several times to discuss revisions required to gain the staff's recommendation of approval. In accordance with

those discussions, Whitehead Oil submitted a revised site plan on December 30, 1986, and its final revised site plan on January 8, 1987. By the revised plan, Whitehead Oil removed the carwash from the lower level of the proposed building and replaced it with office space and changed the setbacks, drives, and other details. On January 9, 1987, the commission staff completed its report, recommending that the application be approved subject to several conditions.

On January 12, 1987, the city council adopted Stoll's proposed zoning amendment for B-2 districts. On January 21, the commission held a public hearing to consider Whitehead Oil's use permit as amended. According to the commission's rules at the time, the application typically would have been voted on at the next commission meeting, which was scheduled for January 28, on which date the commission met to consider Whitehead Oil's application. It was advised that a petition to amend the zoning ordinance had been filed that day by the Southwood Neighborhood Association to change the larger parcel's zoning designation from B-2 to O-3 "in order that no retail activity (including convenience stores) be allowed . . . ." Neither convenience stores nor service stations selling gasoline are permitted in O-3 districts.

After considerable discussion and after being advised by its legal counsel that it could not consider the petition for change of zone until its March meeting, the commission voted to defer action on Whitehead Oil's use permit application until the first meeting in March. This was done to allow the two matters to be considered together. If action had been taken on the use permit by the commission on January 28, 1987, the city council would have held a public hearing on the matter on February 23.

On January 30, 1987, Whitehead Oil appealed the commission's delay of action on its use permit to the city council, requesting that it order the commission to forward its recommendation. The city council considered the appeal at its February 2 meeting and ordered the commission to forward its recommendation. On February 18, the commission complied, recommending that Whitehead Oil's use permit be approved subject to the specific and general conditions contained in the report of its staff, including the installation, at Whitehead Oil's

cost, of a traffic light at 25th Street and Old Cheney Road, if agreeable to the city's traffic engineer.

The commission staff had advised Whitehead Oil that consideration of its use permit before the city council was tentatively scheduled for March 16, 1987. On February 23, the city council voted to hold the hearing on the use permit at an evening meeting to be held Monday, March 30, at 6:30 p.m. However, on March 9, the city council decided to defer the public hearing once again until the April 6 day meeting in order to allow it to consider an O-3 use permit application by Lincoln Mutual for the property it owned in the larger parcel, together with Whitehead Oil's use permit and the neighborhood association's requested zone change.

On March 18, 1987, the commission held a public hearing on the neighborhood association's change of zone request. Area residents and Lincoln Mutual appeared to oppose construction of a convenience store and to favor rezoning the larger parcel to an O-3 district for office use. The commission staff had, by its report and recommendation dated February 20, recommended approval of the change of zone to 0-3 as being in closer conformity with the comprehensive plan and as encouraging development in character with the established land uses in the adjacent area. The commission met on March 25 to make its recommendation to the city council and, after rejecting a motion to approve the staff recommendation, voted 5 to 3 to recommend denial of the change of zone. Although the usual procedure was to docket matters for the city council's agenda after obtaining the commission's recommendation, Stoll had placed the change of zone request on the city council's agenda prior to the meeting at which the commission was scheduled to make its recommendation.

A public hearing before the city council was held on April 6, 1987, to discuss the three pending matters: Whitehead Oil's use permit, Lincoln Mutual's use permit, and the neighborhood association's change of zone request. The staff, Whitehead Oil, and representatives of area residents agreed to a 4-week deferral to allow time to pursue a possible exchange of property between Whitehead Oil and the city to resolve the competing interests. Since the record makes no other reference to this proposed

exchange, it appears the effort was not fruitful.

The public hearing before the city council resumed on May 26, 1987. The neighborhood association presented a unanimous resolution of its board, representing 470 property owners, requesting that the larger parcel be rezoned. Numerous area residents and property owners appeared, spoke in opposition to Whitehead Oil's use permit, and requested that the property be rezoned. The president of an elementary school parent-teacher organization expressed opposition to Whitehead Oil's use permit and support for rezoning, voicing concern for the safety of schoolchildren who would frequent a convenience store and cross Old Cheney Road without the benefit of a protected crosswalk. Lincoln Mutual, which owns a majority of the larger parcel, appeared to request that the larger parcel be rezoned and that its requested use permit be approved to allow it to construct an office park consistent with its prior use permit as approved in 1982, except that the use would be for an office park rather than an office-retail park.

On June 1, 1987, the city council changed the zoning designation of the larger parcel from B-2 to O-3, denied Whitehead Oil's use permit, and approved Lincoln Mutual's use permit for an office park in the new O-3 district.

## IV. ANALYSIS

In *Whitehead Oil I*, we cited *City of Omaha v. Glissmann*, 151 Neb. 895, 39 N.W.2d 828 (1949), *appeal dismissed* 339 U.S. 960, 70 S. Ct. 1002, 94 L. Ed. 1370 (1950), *reh'g denied* 340 U.S. 847, 71 S. Ct. 15, 95 L. Ed. 621, for the proposition that property owners may have vested rights in their property such as to preclude zoning changes. Therein, a municipality had issued a permit allowing the establishment of a trailer park subject to approval by its building department. Prior to any action by the building department, a petition to reconsider the granting of the permit was filed by residents in the area. Upon reconsideration, the planning authority submitted its report and proposed an ordinance to rezone the property to a residential district, which would eliminate the trailer park uses. The ordinance was passed by the municipality. The *Glissmann* court held not only that the property owner had no vested rights

precluding amendment of the zone of the property, but also that the municipality had not acted arbitrarily and capriciously in passing the zoning ordinance:

"What is the public good as it relates to zoning ordinances affecting the use of property is, primarily, a matter lying within the discretion and determination of the municipal body to which the power and function of zoning is committed, and unless an abuse of this discretion has been clearly shown it is not the province of the court to interfere. * * *

"In passing upon the validity of zoning ordinances, an appellate court should give great weight to the determination of local authorities and local courts especially familiar with local conditions."

*Glissmann*, 151 Neb. at 905-06, 39 N.W.2d at 835.

In applying the *Glissmann* analysis in *Whitehead Oil I*, we wrote:

[A] landowner has no vested right in the continuity of zoning in a particular area so as to preclude subsequent amendment, and a zoning regulation may be retroactively applied to deny an application for a building permit even though the permit could lawfully have issued at the time of application. . . .

Nonetheless, a new zoning ordinance will not have retroactive effect where an applicant has substantially changed position in good-faith reliance upon the existing zoning by causing substantial construction to be made or by incurring substantial expenses related to construction. . . . . This substantial reliance exception is basically an application of the rule that a zoning ordinance may not, without providing a reasonable plan for discontinuance, operate retroactively to deprive a property owner of previously vested rights by preventing a use to which the property was put before enactment of the prohibitory ordinance.

234 Neb. at 532-33, 451 N.W.2d at 706.

We also determined that the expenditures made by Whitehead Oil in preparing to obtain the use permit were, as a matter of law, not so substantial as to deprive the city of the

right to exercise its police power, but observed that, nonetheless,

a zoning authority may not use its powers to reward its friends or punish its enemies; thus, where a zoning authority is guilty of misconduct or bad faith in its dealings with the applicant for a use permit in accordance with the then existing zoning regulation or arbitrarily and unreasonably adopts a new regulation in order to frustrate the applicant's plans for development rather than to promote the general welfare, the new regulation may not be applied retroactively. *Commercial Prop., Inc. v. Peternel*, 418 Pa. 304, 211 A.2d 514 (1965); *Nott v. Wolff*, 18 Ill. 2d 362, 163 N.E.2d 809 (1960); *Sunset View Cemetery Assn. v. Kraintz*, 196 Cal. App. 2d 115, 16 Cal. Rptr. 317 (1961). See, also, *City of Omaha v. Glissmann, supra*; *Willingham v. City of Dearborn*, 359 Mich. 7, 101 N.W.2d 294 (1960).

*Whitehead Oil I*, 234 Neb. at 534, 451 N.W.2d at 706-07.

The issue of material fact which precluded the issuance of summary judgment is as follows:

Whether Lincoln, by delaying action on Whitehead Oil's application until after adopting the neighborhood representative's proposal for a change of zoning, acted arbitrarily and unreasonably or in bad faith in order to prevent Whitehead Oil from acquiring a permit to operate a convenience store on its property or, rather, acted reasonably and in good faith to promote the general welfare is a question of material fact, concerning which there is a genuine issue.

*Id*. at 534, 451 N.W.2d at 707.

The factual record, as summarized in part III above, divides the question into two parts: (1) whether the denial of Whitehead Oil's use permit resulted from an arbitrary and unreasonable change in the zoning designation for the larger parcel, and (2) if so, whether there were other bases upon which the city could properly deny Whitehead Oil the use permit sought.

## 1. Change in Zoning

We begin our consideration of the first aspect of that

question by recalling that in reviewing the decision of a city council, it is presumed that the council acted "in good faith, with honest motives, and for the purpose of promoting the public good and protecting the public interest." *Day v. City of Beatrice,* 169 Neb. 858, 865, 101 N.W.2d 481, 487 (1960). Accord *Best v. City of Omaha,* 138 Neb. 325, 293 N.W. 116 (1940).

Furthermore, as stated in *McCrea v. Cunningham,* 202 Neb. 638, 648, 277 N.W.2d 52, 58 (1979):

> "A legal presumption exists in favor of validity, and unless the contrary appears upon the face of the ordinance, the burden is upon the party attacking it as invalid to show by clear and unequivocal evidence that the regulation imposed by it is so arbitrary, unreasonable, or confiscatory as to amount to depriving such party of property without due process of law. . . ."

Accord, *Bucholz v. City of Omaha,* 174 Neb. 862, 120 N.W.2d 270 (1963); *Weber v. City of Grand Island,* 165 Neb. 827, 87 N.W.2d 575 (1958); *City of Omaha v. Glissmann,* 151 Neb. 895, 39 N.W.2d 828 (1949), *appeal dismissed* 339 U.S. 960, 70 S. Ct. 1002, 94 L. Ed. 1370 (1950), *reh'g denied* 340 U.S. 847, 71 S. Ct. 15, 95 L. Ed. 621. The presumption is, of course, rebuttable. *In re Estate of Novak,* 235 Neb. 939, 458 N.W.2d 221 (1990).

In *Whitehead Oil I,* several cases from other jurisdictions were relied upon as persuasive authority for the proposition that

> where a zoning authority is guilty of misconduct or bad faith in its dealings with the applicant for a use permit in accordance with the then existing zoning regulation or arbitrarily and unreasonably adopts a new regulation in order to frustrate the applicant's plans for development rather than to promote the general welfare, the new regulation may not be applied retroactively.

234 Neb. at 534, 451 N.W.2d at 706-07.

The decisions on this issue are necessarily driven by the facts of each case, and because of the heavy presumption of validity discussed earlier, there is a plethora of reported decisions affirming the denial of a building or similar permit. See,

generally, Annot., Retroactive Effect of Zoning Regulation, in Absence of Saving Clause, on Pending Application for Building Permit, 50 A.L.R.3d 596 (1973). Obviously, jurisdictions vary in their analytical approaches, some making it more difficult for the property owner to prevail than others. As a result, we, in reviewing the district court's resolution of this case, focus on the cases cited in *Whitehead Oil I* and similar decisions in which denial of the permit sought was held to be arbitrary and capricious.

For example, in April 1963, the applicant in *Commercial Prop., Inc. v. Peternel*, 418 Pa. 304, 211 A.2d 514 (1965), sought approval of a site plan for construction of a shopping center, which site plan was revised after objections were posed at a public hearing. Further revisions were made due to additional objections; however, in June 1963, the appropriate authority denied the plan notwithstanding the revisions which had been made and issued a letter outlining 16 objections to be overcome in order to secure approval. Meanwhile, on July 8, a proposal to rezone the property from commercial to residential was introduced. In late July, the applicant's site plan was approved by the appropriate intermediate authority as being in technical compliance. However, the township refused to issue a grading permit and, because of the pending zoning change, in November denied the applicant's request for a building permit. The change of zone was not enacted until June 1964, long after a mandamus action had been filed by the applicant. The appellate court held that the applicant had met all requirements for the issuance of a building permit and that mandamus was proper. It agreed with the lower court's conclusion that the sole purpose of the zoning change was to prevent the applicant from constructing the planned project, and the zoning change was therefore arbitrary and unreasonable. It wrote that in so deciding, it imputed "no personal vindictiveness to the township officials who apparently were striving to maintain the high character of their bailiwick and to represent the desires of their constituency. But, while their motives may have been of the highest sort, their course of action was ill conceived." *Id*. at 311-12, 211 A.2d at 519.

In *Nott v. Wolff*, 18 Ill. 2d 362, 163 N.E.2d 809 (1960), the

property owner, in October 1956, sought a building permit for construction of a motel in an area zoned to allow such use. In November, a change of zone to preclude the use was introduced, and it was subsequently adopted the following January. The appellate court affirmed the trial court's issuance of a writ of mandamus to compel issuance of the permit and its holding that the change of zone was invalid. Although the appellate court appears to balance the interests at issue between the applicant and adjoining owners, it held that "the enactment of this ordinance was more emotional than necessary" and was therefore arbitrary and unreasonable. *Id*. at 369, 163 N.E.2d at 813.

A building permit was denied in *Willingham v. City of Dearborn*, 359 Mich. 7, 101 N.W.2d 294 (1960), on the basis that the setback was inadequate; however, the relevant ordinances contained no setback requirements. After a writ of mandamus was filed, the city amended the ordinance to include the requirement, then sought to interpose it as an objection. The court affirmed the trial court's refusal to consider the amendment and its issuance of the mandamus.

In much the same fashion, the court in *Sunset View Cemetery Association v. Kraintz*, 196 Cal. App. 2d 115, 16 Cal. Rptr. 317 (1961), invalidated an emergency ordinance enacted 1 day after a writ of mandamus ordering the city to accept the application for a building permit authorizing the construction of a mortuary. The ordinance rezoned the area around the property in question so as to preclude putting the property in question to mortuary or related uses. The appellate court, in so holding, declared:

> Nothing in the record in the instant case indicates that the ordinance formed any part of a zoning plan or that appellant had even contemplated the ordinance before the trial court's first decision; the enactment of the ordinance stemmed from the county's attempt to frustrate respondent's plans. The generality of the language of the ordinance does not conceal its single, realistic purpose: the prohibition of respondent's mortuary. As amicus curiae in behalf of respondent state, "Such an isolation of one party as the object of the Board's legislative action is a

plain discrimination; one that cannot survive testing under accepted principles of constitutional law.

*Id.* at 123-24, 16 Cal. Rptr. at 322-23.

Other cases with holdings similar to those discussed above include *Marmah, Inc. v. Greenwich*, 176 Conn. 116, 405 A.2d 63 (1978); *Linda Dev. Corp. v. Plymouth Twp. et al.*, 3 Pa. Commw. 334, 281 A.2d 784 (1971); *Limekiln Golf C., Inc. v. Zoning Bd. of Adj.*, 1 Pa. Commw. 499, 275 A.2d 896 (1971) (reversing local authority's denial of special exception permit and remanding to township for determination on that discretionary matter, due to invalid subsequent zoning ordinance); *Brown v. Terhune*, 125 N.J.L. 618, 18 A.2d 73 (1941), *appeal dismissed* 127 N.J.L. 554, 23 A.2d 575 (1942); and *State ex rel. Humble Oil & Ref. Co. v. Wahner*, 25 Wis. 2d 1, 130 N.W.2d 304 (1964). The common factor in the foregoing cases is the incorporation of zoning changes contemporaneously with the denial of a formerly permitted use.

Here, the larger parcel had been zoned for over two decades so as to permit the use Whitehead Oil sought. Although the neighborhood shopping center designation was not retained for the larger parcel in the 1977 and 1985 comprehensive plans, no effort had been made to reflect that the city anticipated a change in the zoning designation of the parcel. In fact, a substantial portion of the larger parcel was developed for uses consistent with the commercial designation, and except for Whitehead Oil's property, a use permit had been issued for all of the remaining undeveloped area of the larger parcel for use as an office-retail park. As noted in *Pine Hill Concrete Mix Corporation v. Town of Newstead Zoning Board of Appeals*, 161 A.D.2d 1187, 559 N.Y.S.2d 48, 49 (1990), *appeal denied* 77 N.Y.2d 803, 569 N.E.2d 874, 568 N.Y.S.2d 15 (1991), " 'the inclusion of a use in the ordinance is a per se finding that it is in harmony with the neighborhood.' " Although the change of zoning designation encompassed a larger area, the true intent of the change was that only Whitehead Oil's property be affected, and that was the result achieved. Likewise, the simultaneous issuance of a new use permit to Lincoln Mutual for an office park rather than the virtually identical office-retail park shields

the larger parcel, except for that portion which constitutes Whitehead Oil's property.

The fact that the petition for a change of zoning was filed by the protesting neighborhood association on the same day the commission was scheduled to issue a recommendation is not insignificant. Although the neighborhood association's express objective to prevent the construction of a convenience store should not be imputed to the city, the circumstance indicates what drove the public opposition and the city's action, a specific reaction against a previously permitted use.

Even more troubling is the delay of action on Whitehead Oil's application so as to allow the change of zoning request to "catch up" with the use permit such that the two could be considered in conjunction with each other. It is precisely this type of delay which is so common and disapproved in the authorities cited in *Whitehead Oil I*.

The fact that the city reacted to the arguably valid concerns of its citizens in the area does not mean that the decision is valid as being based upon concerns for the general welfare. Nor is the city's denial of the existence of any ill will toward Whitehead Oil of any moment. Whatever the motives, a zoning decision which does not promote the general welfare is arbitrary and unreasonable. *Commercial Prop., Inc. v. Peternel*, 418 Pa. 304, 211 A.2d 514 (1965).

The record convinces us that the change in the zoning designation did not promote a legitimate governmental interest in conformance with the comprehensive plan, but merely thwarted Whitehead Oil's previously permissible planned use. We therefore independently reach the same conclusion as the district court, that the city acted arbitrarily and capriciously in changing the zoning designation of the larger parcel from B-2 to 0-3.

## 2. OTHER BASES FOR DENIAL

The city argues that in any event, there were a number of bases upon which to deny Whitehead Oil's application for a use permit even under the preexisting G-1 zoning designation, among them the fact that the use was not in full compliance with the requirements of the G-1 zoning ordinance. There are a

number of flaws in this contention.

First, although the city council was not bound to accept the commission's recommendation, the city's spurning of the recommendation without the articulation of a reasonable basis for so doing is suspect and, under the circumstances presented, untenable. The record convinces us that the city council's decision to deny the use permit was driven by its determination to change the zoning designation because of its aversion to having in the area a convenience store, at which, among other items, gasoline would be sold, and not driven by whether Whitehead Oil's application conformed with the relevant regulations. Indeed, the regulations were scarcely discussed in the city council's public hearing.

Second, the deviations from the regulations are primarily a result of the negotiations had and compromises made with the commission's staff. For example, it was at the staff's suggestion that the gas pumps and canopy were moved farther into the front yard setback in order to increase their distance away from a multifamily dwelling.

Third, due to the complex nature of the zoning regulations and numerous other requirements, virtually all of the use and building permits discussed in the record were approved only after conditions were added on the recommendation of city functionaries, or by the city council on final approval. At some point, the myriad requirements become so onerous that no applicant is able to fully comply unless some deviations are granted. The very nature of a multilayer system of regulation such as exists here increases the risk of arbitrary and capricious action resulting in an unreasonable requirement.

The city also urges that as Whitehead Oil knew that a change of zoning had been requested, it could not in good faith have relied on the preexisting G-1 zoning designation. In addition, the city postulates that even if Whitehead Oil had been granted a use permit under the preexisting zoning designation, the time constraints were such that it could not have acted before the new zoning designation became effective, thus preventing Whitehead Oil from acquiring any vested property rights in a use under the earlier designation. Both of these arguments are without merit, for both beg the question of the validity of the

pending request for a change in the zoning designation.

## V. JUDGMENT

Accordingly, we affirm the decree of the district court, but modify it to the extent that we direct the district court to remand the matter to the city, ordering it to issue Whitehead Oil the use permit it seeks. Inasmuch as Whitehead Oil has posed no objections to the specific and standard conditions contained in the commission staff's recommendation described in part III above (which conditions begin at page 5 of trial exhibit 14C), nor to the installation at its cost of the traffic light described in said part, the permit shall issue subject to the designated specific and standard conditions. The district court shall also direct the city to decide within 60 days of the district court's decree on the mandate herein whether the city wishes to install a traffic light at 25th Street and Old Cheney Road at Whitehead Oil's cost. The city's failure to so decide within said time period shall relieve Whitehead Oil of any obligation in that regard.

AFFIRMED AS MODIFIED, AND CAUSE
REMANDED WITH DIRECTION.